**AFFIDAVIT IN SUPPORT OF
APPLICATIONS FOR SEARCH WARRANTS**

I, Special Agent Adam Rayho, being duly sworn, state under oath:

**Introduction and Agent Background**

1.     I am a Special Agent with Homeland Security Investigations ("HSI") assigned to the Boston Field Office and have been employed by HSI since May 2023.  My primary responsibility is as a criminal investigator assigned to the Cyber Crimes Group.  As a member of the Cyber Crimes Group, I am responsible for conducting investigations involving crimes that have a nexus to the clearnet or dark web. Prior to becoming a Special Agent, I was a detective with the Nashua, New Hampshire Police Department, and a deputized task force officer (TFO) for HSI.  I became a certified police officer in the State of New Hampshire in May 2014 after graduating from the 164th New Hampshire Police Standards and Training Academy.  I hold a bachelor's degree in criminal justice, with a minor in computer science and victimology, from Endicott College.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.     During my career in law enforcement, I have received training and gained experience related to a variety of criminal activities.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the illegal manufacturing, smuggling, and distribution of contraband, to include firearms.  I have participated in all aspects of firearm investigations under Title 18, U.S.C. Chapter 44,  including investigations into trafficking firearms and possession of firearms by prohibited persons. Through my training and experience, as well as my discussions with other agents, I am familiar with the manner in which firearms are imported, transported, stored, and distributed, and the

methods of payment for such firearms.  I am aware that prohibited persons often receive firearms and firearm parts through the United States mails.

**Purpose of Affidavit**

3.      I am currently investigating Angel D. NEGRON (hereinafter, "NEGRON") for violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm and Ammunition) and 18 U.S.C. § 922(a)(1)(A) (Unlawful Manufacture of Firearms) (hereinafter, the "Target Offenses").

4.      I submit this affidavit in support of an application for a search warrant to search the residence of NEGRON, located at 83 Lubec Street, Apartment 1, East Boston, Massachusetts (hereinafter, the "Target Location"), as described in Attachment A-1, and the person of NEGRON, as described in Attachment A-2, for evidence, fruits, and instrumentalities of the Target Offenses, as further described in Attachment B.  Based on the facts set forth in this affidavit, there is probable cause to believe NEGRON is a convicted felon that is unlawfully possessing a firearm inside the Target Location.

5.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

NEGRON's Status as a Convicted Felon

6.      NEGRON is a convicted felon and is thus prohibited from possessing firearms and ammunition.  In 2007, NEGRON was convicted in Suffolk Superior Court, Docket 0684cr11072 of possession of a firearm without a license and carrying a loaded firearm. NEGRON was sentenced to a term of imprisonment of two years in the house of correction on

the first count and two and half years on the second count, with six months to be served from and after the sentence on the first count and the balance suspended for two years, with probation to begin from and after his release.

Background of Investigation

7.        On March 3, 2026, Homeland Security Investigations (HSI) New England Cyber Crimes Group received information from HSI Baltimore regarding an individual in East Boston, Massachusetts in possession of a ghost gun.[1]  HSI Baltimore advised the company "TACDOM," a firearm company, contacted them after a customer with user ID "angeldn617," submitted a written complaint regarding Order: 22-14255-48131 that a trigger he purchased from TACDOM's eBay store did not fit his firearm properly.  The user ID "angeldn617" sent a photograph of a pistol with the TACDOM trigger attached.  Of note, the pistol is also equipped with a Wolf EDG optic, Warriorland MB1 tactical light, and a magazine extension, as pictured below:

---

[1]  The term "ghost gun" refers to a Privately Made Firearm (PMF). Privately made firearms (PMFs) are firearms (including a frame or receiver) that have been completed, assembled or otherwise produced by a person other than a licensed manufacturer. PMFs are also made without a serial number placed by a licensed manufacturer at the time the firearm was produced. (atf.gov/firearms/privately-made-firearms).



8.          After "angeldn617" sent the photograph of the pistol, the following dialogue ensued:

NEGRON: It is a 3D printed frame and is been working with an oem bar and OC trigger shoe just fine.

TACDOM: That is not Glock. So for starters we don't state 3D printed home made no serialized frames. We state GLOCK.

9.          I know that 18 U.S.C. § 921(a)(3) defines "firearm" in pertinent part as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" *and* "the frame or receiver of any such weapon." Based on my training and experience, I believe the pistol depicted in the photograph that "angeldn617" sent to TACDOM eBay constitutes a "firearm" under this definition.  Specifically,

4

based on the content of the communication, "angeldn617" stated the pistol was comprised of a "3D printed frame," which itself is classified as a "firearm" under federal law. Additionally, "angeldn617" stated the pistol had been "working," which indicates the pistol was recently functional. Based on my training and experience, I interpret the communication to mean that the lower receiver of the firearm had been 3D printed and that past installations of parts to the lower receiver had made the firearm functional.

10. On March 4, 2026, investigators sent a subpoena to eBay for information about the user ID "angeldn617." EBay confirmed the user ID belonged to "Angel NEGRON", with associated shipping address "83 Lubec St, Apt 1, East Boston, MA 02128" (the "Target Location"). EBay also provided the number (781)-731-3514 as being associated with the account, email address dnegs620@gmail.com, and an IP address associated with the registration of the account on November 24, 2019[2]. Through my training and experience, I know NEGRON would be required to use an internet capable device to access eBay and his email. This is bulstered by an IP address being associated with his registration, meaning he was connected to the internet to register his account.

11. Investigators reviewed items NEGRON purchased on his eBay account and identified 29 firearm related purchases between January 14, 2026, and March 2, 2026. Based on the information provided by eBay, the following purchases were shipped to the Target Location:

---

[2] Through my training and experience, I know obtaining subscriber information for this IP address would not be possible due to it being too old. Most companies only retain subscriber information for six months.

| Date | Item Ordered |
|---|---|
| 14 Jan 2026 | Locking Block For Glock 17 Gen 3 Made from Stainless Steel |
| 15 Jan 2026 | Fits Glock 17 GEN 3 Complete Lower and Upper Parts Kit Free Shipping |
| 18 Jan 2026 | |

| Date | Item Ordered |
|---|---|
| | 2 - Glock OEM 17, 34, 19x 9mm 10 Round Pistol Magazine 10rd Factory Mag MF10017 |
| 18 Jan 2026 | OEM GLOCK 17 GEN 3 COMPLETE SLIDE,HGW BARREL,DPM,MASS DRIVER COMP,& Many More! |
| 19 Jan 2026 | Replacement Slide Lock Spring for Gen 5 Glock 17, 19, 19X, 26, 34, 44, 45, |
| 27 Jan 2026 | 2 Pack - OEM Slide Lock Spring for GLOCK 17/20/21/22/31 - High Quality |
| 03 Feb 2026 | MB1 500 Lumens Weapon Light-Red Laser&White LED Combo wi/Glock17/19 Claw Holster |
| 14 Feb 2026 | Ghost ULTIMATE 3.5lb Trigger Connector for Glock 17 19 20 21 22 23 24 26 27 |
| 14 Feb 2026 | NDZ Glock 19 Gen 4 Extended Control Kit ESLL Pins Ghost Bullet Slide Release PVD |
| 16 Feb 2026 | GEN 1-3 17 19 26 34 OEM TRIGGER HOUSING OVERTRAVEL STOP FITS GLOCK 9MM *NO EJECT |
| 19 Feb 2026 | Locking Block For Glock 17 Gen 3 Made from Stainless Steel |
| 19 Feb 2026 | Cross Armory GOLD TALL Suppressor Height Sights Fr GLOCK 17 19 22 23 FIBER OPTIC |
| 21 Feb 2026 | Pack of 5 Glock Magazine Catch Spring for all Glock except ambidextrous models |
| 21 Feb 2026 | |

6

| | |
|---|---|
| | AGGRESSIVE ARMS PULVERIZER COPPER +0 MAGAZINE EXTENSION BASE PAD GLOCK 17 22 34 |
| 22 Feb 2026 | AGGRESSIVE ARMS RAZZOR JEWLERY FINISH GOLD TRIGGER GLOCK 20 21 GEN 3 + OEM BAR |
| 22 Feb 2026 | OEM GLOCK 21 .45 ACP FACTORY OEM 10 ROUND MAGAZINE, MF10021 SAME DAY SHIPPING |
| 22 Feb 2026 | RANGER PROOF w/ Johnny GL0CK VEX F3 ADJUSTABLE TRIGGER COPPER 17 19 43X GEN 1-5 |
| 22 Feb 2026 | Glock OEM Gen 3 Trigger Housing  20 21 29 30 30S 36 37 40 SP 08203 free sticker! |
| 22 Feb 2026 | Ghost Glock Gen 1-4 17 19 20 21 22 23 26 Bullet Extended Slide Stop Release PVD |
| 22 Feb 2026 | AGGRESSIVE ARMS SHINY GOLD Magazine Catch Slide Stop PINS GL0CK 20 21 29 30 36 |
| 28 Feb 2026 | TS Guide Rod Assemblies  For GLOCK 20 20SF 21 21SF, GEN 1 2 3 Choose Color, Size |
| 28 Feb 2026 | NDZ Glock 20 21 29 30 40 41 Extended Magazine Floor Plate Aluminum Anodized |
| 28 Feb 2026 | XL LOUIS BRASS Glock Gen 1-5 GOLD Backplate Slide Plate 17 19 26 27 (((( BLEM))) |
| 28 Feb 2026 | Swampfox Justice II 1x30mm 6MOA Red/Green Dot Sight Multi Reticle RMR footprint |
| | |

| 01 Mar 2026 | X Power Trigger Spring for G Model 6lb GEN 1-4 17 19 20 21 22 23 |
| 01 Mar 2026 | Firing Pin Safety Plunger Spring  Factory or Reduced for Glock Gen 1 2 3 4 5 |
| 01 Mar 2026 | Timney Competition Trigger 3lb Pull BRONZE Alpha Glock 17 19 22 23 34 Gen 3 & 4 |
| 01 Mar 2026 | for Glock Wolff Striker Spring Kit Reduced Power GEN 1-4 17 19 20 21 22 23 26 |
| 02 Mar 2026 | Glock SP05865 OEM Armorer's Inspection Half Slide Cover Plate 17 19 36, Orange |

12.　　　　Investigators located the "RANGER PROOF w/Johnny Gl0CK VEX F3 ADJUSTABLE TRIGGER COPPER 17 19 43 GEN 1-5" in NEGRON's purchase history, which he ordered on February 22, 2022.  As discussed *supra*, this item is the trigger that NEGRON submitted a complaint about to TACDOM.  Investigators requested information from TACDOM about the purchase.  TACDOM identified the purchase as Order: 22-14255-48131, and identified the recipient information as Angel Negron at the Target Location.  The items were shipped from "TACDOM, PO Box 474, Bonita, CA 91908."

13.　　　　Investigators also identified two other items in NEGRON's purchase history that are visually consistent with  accessories on the firearm shown in the photograph that NEGRON sent to TACDOM on or about March 2, 2026.  Specifically, on February 3, 2026, NEGRON purchased one "MB1 500 Lumens Weapon Light-Red Laser&White LED Combo wi/Glock17/19 Claw Holster" from the seller "warriorlandstore2."  This item appears visually consistent with  the light mounted on the pictured firearm.  Additionally, on February 22, 2026, NEGRON purchased one "AGGRESSIVE ARMS SHINY GOLD Magazine Catch Slide Stop PINS GLOCK 20 21 29 30 36" from the seller TACDOM.  This item appears visually consistent with the gold magazine release and slide lock on the same firearm.

14.        On March 6, 2026, investigators sent a subpoena to T-Mobile for information about (781)-731-3514, which was listed on NEGRON's eBay account as well as NEGRON's order from TACDOM on February 22, 2026.  T-Mobile confirmed the customer name on the account was NEGRON, with the Target Location listed as both the service address and billing address.  T-Mobile informed investigators that NEGRON had been the subscriber of this phone number since September 28, 2014, and that the phone number was currently active.

<u>In January and February 2026, NEGRON Made Posts on His Facebook Account Indicating He Has a 3d Printer</u>

15.        On March 12, 2026, investigators identified NEGRON's public-facing Facebook account:



16.        While reviewing the account, investigators observed that NEGRON made several posts in January and February of 2026, which indicate that he owns a 3D printer:







17.     I know from my training and experience that it is common for individuals who are prohibited from possessing firearms to use 3D printers to make firearm parts.  These individuals often use 3D printers to make the "frame" of the firearm or the "receiver," which

they combine with other gun parts to make "ghost guns." Considering the totality of the circumstances, which include the complaint NEGRON made to TACDOM, where he admitted his pistol had a "3D printed frame," the 29 firearm related purchased he made from January 16 to March 2, 2026, and the videos of the 3D Printer NEGRON posted on his Facebook, I believe NEGRON owns a 3D printer and is using it to make ghost guns.

<u>Surveillance of the Target Location</u>

18.     On March 10, 2026, investigators conducted surveillance of the Target Location. The Target Location is located within a three-story apartment building. Investigators looked through the front door of the apartment building and observed Apartment 1 was located on the left-hand side. Investigators were also able to observe a staircase which leads to other apartments on different floors of the building. There were no other apartments on the first floor of the building. Investigators observed several mailboxes in a small foyer just inside the front door. On the mailbox for Apartment 1 were the following names "Jeralph G. ROSAL, Badreddine QUENJEL, NEGRON, Emerson MAINARDES." Investigators believe that QUENJEL and MAINARDES are current roommates of NEGRON[3].

19.     Leading up to the surveillance, investigators identified several packages from companies that sell firearm parts and accessories that were set to be delivered to NEGRON at the Target Location. On March 12, 2026, investigators set up surveillance at the Target Location in anticipation of the delivery of the packages. At approximately 1:52 p.m., an unknown delivery service delivered several packages to the foyer area of 83 Lubec Street. Approximately 5

---

[3] NEGRON's RMV address is listed as 217 Trenton Street, Apt 2, East Boston, MA. NEGRON's privileges to drive in Massachusetts are currently suspended and he only possess a Massachusetts Identification Card. NEGRON's driver's license was issused in 2006.

minutes later, at 1:57 p.m., a male, later identified as NEGRON[4], appeared in the foyer area and picked up the package and returned inside.  Investigators did not observe the male go up or down the staircase on the main floor of the building, which indicates the male came from and returned to Apartment 1 on the first floor.

20.	At approximately 2:38 p.m., investigators observed a USPS carrier deliver additional packages to the mailboxes within the foyer area of 83 Lubec Street.  At approximately 2:45 p.m., investigators observed NEGRON re-enter the foyer area and look at his phone before going back inside:



21.	Approximately one minute later, investigators observed NEGRON re-enter the foyer area and use a key to open a mailbox.  Investigators then observed NEGRON remove mail, and walk back inside the building.  Investigators did not observe NEGRON go up or down

---

[4] Investigators viewed NEGRON's RMV picture, Facebook account, and known tattoos, at which point they were able to confirm the male they observed was NEGRON.

the stairs on the main floor, indicating that he returned to the Target Location, which is the only apartment on the first floor of the building.

22.    Investigators examined USPS business records and observed a package bearing tracking number 9400 1081 0624 4893 4962 35 from GoToGear and a package bearing tracking number 9400 1081 0624 4894 3300 95 from BZ Green were delivered to NEGRON at the Target Location at approximately 2:38 p.m.  Investigators are aware that both companies sell firearm parts and accessories.

### Summary

23.    There is probable cause to believe NEGRON is a felon and that he is unlawfully possessing firearms within the Target Location.  NEGRON is a convicted felon who has been incarcerated for firearm related offenses.  Second, in February 2026, NEGRON ordered a trigger from TACDOM and sent the company a photograph of what I believe to be a functional pistol.

24.    I know from the content of NEGRON's complaint to TACDOM that he made the "frame" of the pistol using a 3D printer.  I know that the "frame" is considered a firearm for purposes of federal law.  The rest of the firearm is assembled from parts that were manufactured outside the state of Massachusetts.  For example, the "slide" is made by GLOCK, which is manufactured in Austria; the optic is made by WOLF EDG, which is manufactured in Kennesaw, Georgia; the tactical light is made by Warriorland, which is manufactured in China; and the trigger that NEGRON ordered from TACDOM is manufactured in California.  Thus, there is a fair probability that NEGRON's firearm is composed of firearm parts that traveled through interstate commerce.

13

25.        There is also probable cause to believe that evidence of the Target Offense will be located in the Target Location.  I know from my investigation that NEGRON ordered 29 firearm related parts between January 16, 2026 to March 2, 2026.  I also know from my investigation that NEGRON has access to a 3D printer, and has stated a gun in his possession had the frame 3D printed.  Based on my training and experience, I know that it is common for prohibited persons, such as NEGRON, to make functional firearms using 3D printers and miscelllaneous parts from firearm companies.  This technique is favored by prohibited persons because ghost guns are virtually untraceable, unserialized, and can be acquired without a background check.  I know from my training and experience that it is common for individuals to keep firearms in their residences for extended periods of time for a multitude of reasons, to include for self-defense.[5]  NEGRON's purchase history from eBay, which includes 29 firearm related parts shipped to the Target Location in a two-month period, demonstrates that his assembly of firearms is likely part of a continuing pattern of criminal conduct as opposed to an isolated incident or single transaction.

26.        Additionally, NEGRON's complaint to TACDOM stated that his 3D printed frame had been "working" with an "oem bar and OC trigger shoe just fine."  Based on my training and experience, I believe the term "oem" refers to "original equipment manufacturer," which in this context means GLOCK, which is manufactured in Austria.  I further believe the reference to "OC trigger shoe," is a reference to an aftermarket replacement for the stock GLOCK trigger shoe, which is designed to reduce pre-travel, over-travel, and trigger bite. In laymens terms, the "OC trigger shoe" is an aftermarket replacement for the stock trigger

---

[5] I know from my investigation that NEGRON does not own a vehicle, which makes it even more likely he stores his firearms in the Target Location.

14

designed to improve performance and comfort.  Furthermore, I believe NEGRON's statement that his firearm had been "working" is an admission that his firearm is functional and that NEGRON has fired the pistol.  I know from my training and experience that in order for a firearm to be functional, it must be designed or readily converted to "expel a projectile (i.e. ammunition) by the action of an explosive."  I know from my training and experience that individuals who possess firearms also often possess ammunition.  I believe there is a fair probability that ammunition will also be found in the Target Location based on NEGRON's own admission that his firearm was functional, the fact NEGRON does not own a vehicle (which is another common place for individuals to store firearms and ammunition), and my training and experience that firearm owners often store ammunition in their residences.

27.     I also believe there is a fair probability that NEGRON's electronic equipment, such as his cell phone and computer equipment will be found in the Target Location.  NEGRON utilized the Internet to order dozens of firearm related parts through eBay.  I know from my training and experience that Internet sites such as eBay can be accessed from cell phones and computers.

**SEIZURE OF COMPUTER EQUIPMENT AND DATA**

28.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data.  Examining data stored on devices of this type

15

can uncover, among other things, evidence of communications and evidence that reveals or suggests who possessed or used the device.

29.     Based on the information obtained from TACDOM and eBay which shows a picture of a firearm and the purchase of dozens of firearm parts/accessories, I am aware NEGRON would need to utilize a mobile telephone, computer, or any other digital device that can access the internet to communicate with TACDOM and place the orders through eBay. Additionally, I am aware in order to check on packages being delivered to an address, an individual would need to utilize a mobile telephone, computer, or any other digital device that can access the internet to do so.

30.     I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription.  Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time, 76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop computer.  Further, according to the Pew Research Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability (a "smartphone").  The percentage of adults that own a smartphone is even higher among younger demographic groups:  96 percent of 18–29-year-olds, 92 percent of 30–49-year-olds, and 79 percent of 50–64-year-olds owned smartphones in 2019.

31.     From my training and experience, I am aware that individuals often keep electronic devices, such as cellphones, in their possession at virtually all times, in their homes, in their vehicles, and on their persons.

16

32.	From my training and experience, I am aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated at or to be used at a business, such as e-mail, word-processing documents, photographs, and spreadsheets.

33.	From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

34.	Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

a.	Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.	Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.	Wholly apart from user generated files, computer storage media in particular, computers' internal hard drives contain electronic evidence of how the

computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial

19

evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can

be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    i.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent

35.    Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

    a.    The volume of evidence - storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular

21

files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on site.

b.      Technical requirements - analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

36.      Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

37.      The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in

22

Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

38.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B.  If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

39.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

40.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that

has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

41.     If a device is equipped with a facial-recognition feature, as many Android, Apple, and other devices are, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face. Similar technology allows users to unlock a device specifically through iris recognition.

42.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device

43.      As discussed in this affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode that would unlock the Subject Device(s) found during the search of the Target Location or on the person of NEGRON is not currently known to law enforcement.  Thus, it may be useful to press the finger(s) of the user(s) of the Subject Device(s) found during the search of the Target Premises or the person of NEGRON to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

44.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be unlocked using Touch ID when a certain period of time has elapsed since the device was last unlocked and/or when the device has not been unlocked using a fingerprint and the passcode or password has not been entered in a certain period of time. Similarly, certain Android devices cannot be unlocked with Trusted Face or fingerprint access if the device has remained inactive for a certain number of hours. Other Android and Apple biometric features, and similar features from other brands, carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time

25

45.    Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of NEGRON to the fingerprint scanner of the devices found at the Target Location or on the person of NEGRON; (2) hold the devices found at the Target Location or on the person of NEGRON in front of the face of NEGRON and activate the facial recognition feature; and/or (3) hold the devices found at the Target Location or on the person of NEGRON in front of the face of NEGRON and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. I also request permission to cause NEGRON to remove any mask or facial covering that he might be wearing to facilitate activation of any of the aforementioned biometric features. The proposed warrant does not authorize law enforcement to compel that any person state or otherwise provide the password or any other means that may be used to unlock or access the devices.  Moreover, the proposed warrant does not authorize law enforcement to compel any person to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

46.    I further request that the Court authorize law enforcement to change device settings on any seized device(s) to disable "Stolen Device Protection," which is a security measure that can be used to prevent unauthorized access to the device and data. When enabled, however, this feature might prevent forensic tools from being able to extract data from devices.

## CONCLUSION

47.    Based on all of the foregoing there is probable cause to believe NEGRON has committed, is committing, and will continue to commit violations of the Target Offense, and that

a search of the Target Location, as described in <u>Attachment A-1</u>, and the person of NEGRON, as described in <u>Attachment A-2</u>, will lead to evidence, fruits, and instrumentalities of the Target Offense described in <u>Attachment B</u>.

Respectfully submitted,

_____

Adam Rayho, Special Agent
Homeland Security Investigations

Sworn via telephone in accordance with Fed. R. Crim. P. 4.1
On March ___, 2026

_____

Honorable Paul G. Levenson
United States Magistrate Judge

27

## ATTACHMENT A-1

## LOCATION TO BE SEARCHED

83 Lubec Street, Apartment 1, East Boston, Massachusetts ("Target Location")

83 Lubec Street is a brick three story multi family building. The number "83" is located to the left of the front door. Apartment 1 is located on the first floor and is the only apartment on the first level. The door to apartment 1 has a cross above the door and a sign on the door stating, "Please Remove Your Shoes". Below are pictures of the building and apartment door.[6]

 

---

[6] There is no formal number on the apartment door but based on the other apartments in the building and their corresponding doors, which are clearly labeled, along with surveillance which appeared to show NEGRON entering this apartment, investigators believe apartment 1 is the location referenced above.

**<u>ATTACHMENT A-2</u>**
**PERSON TO BE SEARCHED**

The person to be searched is Angel D. NEGRON (DOB XX/XX/1978), pictured below

from his driver's license photograph from 2006.



**ATTACHMENT B**
Items to be Seized

I.     All records and evidence, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. §922(g)(1) (Felon in Possession of a Firearm and Ammunition) ( the "Target Offense").

   A.     Records and tangible objects pertaining to the following people, entities, telephone numbers, e-mail addresses, and item descriptions, including:

   1.     eBay;

   2.     the use of (781)-731-3514;

   3.     angeldn617;

   4.     TACDOM;

   5.     eBay seller user ID's gotogear, shop_ship_deliver, threeriverssupply, mariasrandomstuff, aimarms, warriorlandstore2, ndzperformance, occustomtriggers, springman2, sjssport-0, st-998003, li-466589, huntview_scope, lifetimekentw, vergonaoutdoors, and couragetactical;

   B.     Records and tangible objects pertaining to the following topics:

   1.     The possession, purchase, sale, transfer, and manufacture of firearms;

   2.     The possession, purchase, sale, and transfer of ammunition;

   3.     The use of 3D printers to fabricate firearms components;

   4.     Locations and methods suitable for test-firing privately manufactured firearms;

   C.     Firearms and firearms parts and components, including slides, frames, receivers, etc.;

   D.     Ammunition;

   E.     3D printers and accessories;

   F.     The payment, receipt, transfer, or storage of money or other things of value by NEGRON pertaining to firearms, firearm parts, and ammunition, including:

30

      1.      Bank, credit union, money transfer, and other financial accounts;

      2.      Credit and debit card accounts;

      3.      Business or personal expenses;

      4.      Cryptocurrency;

G.      The travel or whereabouts of NEGRON from on or about January 14, 2026[7] to present;

H.      For any computer hardware, computer software, computer-related documentation, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

      1.      Evidence of who used, owned, or controlled the computer equipment;

      2.      Evidence of computer software that would allow others to control the items, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

      3.      Evidence of the attachment of other computer hardware or storage media;

      4.      Evidence of counter forensic programs and associated data that are designed to eliminate data;

      5.      Evidence indicating how and when the computer equipment was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

      6.      Records of or information about any Internet Protocol addresses used;

      7.      Passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

      8.      Records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media;

      9.      Records of or information about the computer equipment's Internet activity;

      10.      Contextual information necessary to understand the evidence described in this attachment.

---

[7] According to eBay records, this is the first firearm related purchase by NEGRON.

I.       Records, information, and items relating to the ownership, occupancy, or use of the Target Location (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts, and check registers);

II.    All computer hardware, computer software, and storage media. Off-site searching of these items shall be limited to searching for the items described in paragraph I.

III.    During the execution of the searches of the SUBJECT PREMISES and NEGRON's person, law enforcement personnel are authorized to press the fingers (including thumbs) of NEGRON to the sensor of devices seized pursuant to the warrant and/or to hold such device(s) in front of his face. This warrant does not authorize law enforcement personnel to compel or require that any individual present at the SUBJECT PREMISES at the time of the search state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

IV.    If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

**DEFINITIONS**

For the purpose of this warrant:

A.    "Equipment" means any hardware, software, storage media, and data.

B.    "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.    "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a username; or a password), whether stored deliberately, inadvertently, or automatically.

32

D.      "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

E.      "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.      "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## EXECUTION

Searching agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence authorized by this warrant, as outlined above. If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

## Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally identifying information of victims; or the fruits or instrumentalities of crime.

33